## Cowan's Appeal.

1. A testator devised land to all his children, after the date of his will another was born, at his death the last and the three others were minors. *Held,* that under Acts of April 3d 1840, sect. 4, April 10th 1849, sect. 10, the Orphans' Court had jurisdiction in partition of the real estate devised.

2. A devise was " The farm, &c., I leave jointly and equally to my six children and if my wife may think best to have guardians appointed for my children, such guardians will have the last three properties sold and the money arising from such sale placed at interest for the use of my children, my wife joining the guardians or consenting to such sale." *Held,* that this was a devise directly to the children, subject to a power of sale conditional on the consent of the widow.

3. Upon the birth of the last child the devise opened and she took her share under the intestate laws.

4. A testator gave to his wife the rents and profits of a farm " during her natural life so long remaining my widow," he then gave the farm " to my son Matthew on the event of his mother's death, if on the happening of such he may be 21 years old; not before her demise and his arriving at 21 years can he claim any control or ownership." Matthew attained 21, the widow married and he took possession of the land :—he was appointed guardian of a minor child of testator. Partition in the Orphans' Court was had of all the testator's real estate including this farm, which was adjudged to him, and other land to the four minors jointly, they afterwards had partition amongst themselves in the Common Pleas. Four months after the ward came of age, she, with the widow and her husband and all the other children executed a release to Matthew of all their interest in the farm ; there was no fraud in the release. *Held,* that these proceedings vested the farm in Matthew in severalty.

5. Under the circumstances the release was carrying out a family arrangement of what had been before done and not a mere release from ward to guardian.

6. The tract devised to widow during widowhood was also adjudged to Matthew, in the same partition. *Held,* that he took it discharged from any trust as guardian.

7. Eberts *v.* Eberts, 5 P. F. Smith 110 ; Stanley's Appeal, 8 Barr 431, distinguished. Johnston *v.* Furnier, 19 P. F. Smith 449, followed.

October 27th 1873.   Before READ, C. J., AGNEW, SHARSWOOD, WILLIAMS and MERCUR, JJ.

Appeal from the Orphans' Court of *Westmoreland county :* No. 85, to October and November Term 1872.

In the guardianship account of Matthew Jack, guardian, &c., of Harriet Jack now Cowan: Mrs. Cowan was a daughter of William Jack, deceased.

The decedent died February 28th 1852, leaving a widow Harriet Jack, and six children, William, Matthew, Margaret, Elizabeth, Emily and Harriet; and Nancy, who was born after the date of his will, dated August 11th 1848 and proved March 20th 1852; it contained amongst other provisions, the following :—

To his wife Harriet all his personal property ; also the farm on which he resided during her life, " also the rents and profits of the farm formerly owned by William Best ; * * * also the rents and

profits of the land formerly owned by McKee's heirs, also a small tract of land bought of Eli Coulter, * * * also the profits arising from the place on which Robert McCutcheon resides, together with the rents and profits arising from the farm whereon ———— Nesler now lives, during her natural life, so long remaining my widow.

" The farm west of Greensburg, formerly Arthur .Carr's; also, the land formerly owned by Bushfield's heirs; also, the Bunker Hill property, I leave jointly and equally to my six children, and if my wife may think it best to have guardians appointed for my children, such guardians will have the last three named properties sold and the money arising from such sale placed at interest for the general use of my six children, my wife Harriet joining the guardians or consenting to such sale.    My property 'lying in the borough of Greensburg, as well that part owned by Matthew Jack, deceased, lying in said borough, to which I may be entitled by his will, I bequeath to my six children, equally share and share alike.

" Furthermore, my house and lot in the county and town of Clarion, Pa., I leave to my sons William and Matthew; the tract of land containing about three hundred acres in Snyder township, Jefferson county, Pa., I give and bequeath to my wife Harriet; the two tracts of land in Warsaw township, Jefferson county, Pa., I give and bequeath to my daughters Margaret, Elizabeth, Emily and Harriet, jointly—both tracts containing nearly eight hundred acres.

" The lumbering establishment and mills on Redbank, containing, &c., also the lumbering establishment and mill on Clarion river, &c., I authorize my executors to make sale thereof, and the proceeds of both properties to be put at interest or invested in good stock for the use of my six children jointly and equally; the tract of land in Washington township, Jefferson county, containing, &c., my executors will also sell, and the proceeds from such sale will be invested in stock or placed at interest.    The interest arising from the sale of the last named three properties, * * * will be payable to my wife Harriet for use of my children, and she is not to account in any manner for its application.

" The tract of land formerly owned by John Eason, &c., I direct said land to remain in possession of Mrs. Eason during her natural life, she receiving the rents or profits of said farm.    At the decease of Mrs. Eason, I authorize my executors to offer the same to John and Robert Eason on their paying the purchase-money, with interest to that time.    If the said John and Robert refuse to take, on said terms, I authorize my executors to sell to the highest bidders, and the money arising from this tract is for the exclusive use of my son William Jack, Jr.    My lots in the borough of Brookville, which may remain unsold at the time of my death, I give and bequeath to my four daughters equally.

[Cowan's Appeal.]

"My claim or property, in Kittanning, Armstrong county, arising from the estate of Samuel Jack, Matthew Jack and Henry Jack, deceased, I authorize my executors to have sold.    *    *    *

"That portion of the real estate of said Henry to which I may be entitled, I give and bequeath to my six children jointly, desiring my executors at the death of Wilson Jack to make sales of such interest I may have in the real estate of Henry Jack, the proceeds to be put to interest, and to be equally applied or divided among my six children.    The proceeds, both real and personal, arising out of the estate of Henry Jack are under the control of my wife so long as I may live, and my heirs must obtain her consent before they can claim any interest in such principal or interest arising out of Henry Jack's estate.    After the decease of .my wife Harriet, the amount received of the estate of Henry Jack is to be equally divided among my six children.

"The tract of land in Unity, Westmoreland county, formerly owned by Abraham Horbach, I direct my executors to make sale of, the proceeds to be placed at interest, which interest is payable to my wife Harriet during her natural life ; and further, I order that should my wife decease without making a will and devising to my children what personal and real estate she may be possessed of, I order that whatever of the within enumerated moneys or land may remain to be equally divided among my sons and daughters, share and share alike.

"My executors are allowed to apply any part of the foregoing lands or debts due me to enable them to pay any claims that may be just and right exhibited against me.

"The woodland lying in Hempfield township, adjoining Hugus's heirs, also Hugh Y. Brady and land formerly owned by Turney's heirs, I desire to be retained as timber land for the use of the homestead place, both which tracts of land contain about one hundred and fifty acres.    Having in the body of this testament or will forgotten to name my executors, I hereby nominate and appoint my beloved wife Harriet, Joseph H. Kuhns, Esq., and Thomas Wilson, of Salem township, my executors, with full power to do all acts enumerated in the foregoing will.

"On the decease of my wife Harriet the homestead farm, containing about ninety acres; also, the woodland tract, containing about sixty acres, I devise to my son William Jack, if he may be arrived at twenty-one years of age, and not before he may arrive at such age.

"The farm formerly owned by Wm. Best I give and bequeath to my son Matthew Jack, on the event of his mother's death, if on the happening of such he may be twenty-one years old; not before her demise and his arriving at twenty-one years can he claim any control or ownership."

Letters testamentary were granted to Mrs. Harriet Jack and Joseph H. Kuhns.

The widow and Joseph H. Kuhns, her co-executor, were married December 26th 1852.

To November Term 1861, William Jack, eldest son of the decedent, presented his petition setting forth that the decedent died seised of 21 pieces of real estate, describing them severally: No. 1 was the Homestead farm; No. 2 was the "Best farm;" No. 5 was Horbach place; No. 6 was the Bunker Hill property; No. 7 was the "Bushfield property;" No. 13 to 21 were lots in Greensburg. The petition further set out that the decedent left a widow, since intermarried with J. H. Kuhns, and seven children, four of whom, viz.: Elizabeth, Emily, Harriet and Nancy were minors, and that Nancy was born in the life of the testator, but after the making of his will: the petition set out also the devises of the Bushfield property; Bunker Hill property; the Greensburg lots; the Homestead farm and the Best farm; and the grant of letters testamentary to the widow and Kuhns. The prayer was for an inquest to make partition, &c. On the 20th of November 1861, an inquest was awarded and Matthew Jack was appointed guardian *ad litem* of the minors; personal notice was ordered to be given to all the parties. The inquest returned that the inquisition had been taken after all parties had been warned and that the property could not be parted, &c., but they valued the 21 lots separately. On the 18th of February 1862, Matthew Jack was appointed guardian of the person and estate of Harriet. On the 20th of the same month the inquisition was confirmed, and a rule on heirs to accept or refuse or to show cause why the real estate should not be sold granted. On the 18th of August 1862, No. 1 and No. 12 of the real estate were accepted by William Jack, and awarded to him upon his entering into recognisance "to secure the share of his sister Nancy, being the one-seventh part of said valuation." The other heirs declining he accepted 'and lots No. 11 and No. 15 were adjudged to him, he to enter into recognisance to secure the shares of his brothers and sisters, being one-seventh each. On the same day Matthew Jack accepted for his four wards lot No. 3 at the valuation,; after deducting a proportional part of the expenses, "leaving $7047.63 as the net valuation-money and as devised to them by the will" of the decedent. Also lot No. 13 at the valuation, which after deducting the proportional part of the expenses left $3158.97, and these lots were adjudged to him in trust for his four wards. On the same day, Matthew Jack, in his own right and as devised to him, accepted No. 2, "the Best farm," at the valuation, which after deducting the proportional part of expenses was $14,526.38;" No. 6, the Bunker Hill property, was on the same day adjudged to Margaret Katte, another of the heirs.

[Cowan's Appeal.]

On the 8th of April 1863, all the parties—the minors by their guardian Matthew Jack—"for the purpose of making equal partition and final settlement of the remaining portion of the real estate of the decedent," agreed to take the same at the appraisement of the inquest, in the manner which they set out in the agreement. Matthew Jack taking in his own right, amongst other tracts, the "Bushfield property," devised for the use of the testator's six children; and taking for his four minor sisters as their guardian, two other of the remaining lots.

The agreement set out also in detail the respective lots with their valuation as taken by the heirs; also the amount of their respective shares and the amount to be paid and received by them severally, viz.: William to pay $27.60, Matthew to pay $310.84, Mrs. Katte to pay $216.04, and the four minors to receive $122.36.

By the same agreement they appointed Joseph H. Kuhns their attorney in fact to appear in the Orphans' Court and elect for them, "the said several portions of said real estate, according to the aforegoing our act of partition and agreement." The agreement was under the seals of all the parties, the minors by their guardian Matthew Jack.

On the 14th of May 1863, the attorney, Mr. Kuhns, appeared in court and elected to take the several lots according to the agreement, and they were so adjudged by the Orphans' Court. The agreement as well as the adjudication appears of record in the proceedings in partition in William Jack's estate of November Term 1861.

Elizabeth afterwards married James M. Latta. On the 12th of August 1865, an amicable action of partition of three of the lots adjudged jointly to the minor daughters was instituted in the Court of Common Pleas of Westmoreland county. In this action James M. Latta and Elizabeth his wife, in her right, were plaintiffs and Emily C. Jack, Harriet Jack and Nancy W. Jack, by their guardian, Matthew Jack, defendants; the agreement for the action set out that each of the daughters was entitled to a fourth of the land mentioned on it: and judgment *quod partitio fiat* was entered same day by virtue of authority in the agreement. On the 23d of August the court appointed commissioners to divide or value the real estate the subject of the partition.

The commissioners reported a division of the property into fifteen parts, with a valuation of each. No. 1 was taken by Mrs. Latta at the valuation; No. 4 was not sold; all the remainder was sold under the judgment in partition; Mrs. Cowan arrived at age November 21st 1867; out of the proceeds of this sale she received by different payments up to March 25th 1868, the sum of $420.

On that day the widow of the decedent, with her husband and the children of the testator, including Nancy, who was still in her minority, executed to Matthew Jack a release of "all the estate,

shares, purparts and dividends, right, title, interest, property-claim and demand" in and to the "Best farm."

Harriet was married to Frank Cowan, the appellant, November 3d 1869 ; between the time of her arrival at age, and that time she had received the sum of $348. After her marriage she received $350, making the whole amount which she received from the proceeds of the land the subject of the partition in the Common Pleas, $1138.

Matthew Jack, as guardian of Mrs. Cowan, filed his guardianship account, charging himself with the proceeds of sale of " Brookville lots," and of "lots in partition" amounting to $953.70, and claimed credits amounting to $888.84, showing in his hands a balance of $64.95.

It would appear from the exceptions to this account and the report of the auditors as hereafter stated, that Matthew had sold part of the Bushfield property and some of it remained unsold in his possession.

Mrs. Cowan filed exceptions to the account,—that he should have charged himself with one-seventh of the rents of the Best farm from the marriage of the mother till the settlement of his account ; and with one-sixth of the profits realized from the " Bushfield property."

On the 14th of November 1870, John Armstrong and James C. Clarke, Esquires, were appointed auditors upon the exceptions.

They reported as their opinion that the intention of the testator was to give the "Best farm" to his wife for life or widowhood, with remainder to Matthew, to take effect whenever and by whatever means her estate might be determined.

They further said as regards the first exception, that should their construction of the devise be wrong, Mrs. Cowan was concluded by her release, there having been no fraud and unfairness in procuring it.

They further reported :

" In regard to the 'Bushfield property,' the auditors are of opinion that the same having been devised by Judge Jack, in *trust*, for the use of his daughter Harriet and others, it must retain that impress until the trust or use, for which it was devised, is ended.

" Matthew Jack then, by his acceptance of the guardianship of his sister Harriet, became the *trustee* of her estate, and it was, therefore, his bounden duty to watch her interests with a jealous eye and see that they were properly cared for and protected. Without undertaking to determine the effect of the partition of Judge Jack's real estate, or whether it was void or not (the auditors not deeming the question important under the view they take of the *trust* created in the will for the use of Harriet and others), it is enough to say that the guardian was presumed to know the nature of the position he occupied, and that he could not

make any *profit* to himself out of this trust estate, but held the same for the use of the *cestui que trust*, his ward. The auditors are, therefore, of opinion that Harriet Cowan (late Jack) has an interest in the proceeds of the sales of the 'Bushfield property'—now lots in the borough of Ludwick—she having elected to follow the proceeds and claim her share of the trust, instead of resorting to the law—and that she has a right to demand and recover from the estate of her late guardian, Matthew Jack, the sum of $846.16, being the one-seventh of the amount of said sales, and of the estimated value of the six unsold lots with interest, less the amount of her recognisance (which was the one-seventh of the appraised value of the 'Bushfield property') paid her.

"The account of said guardian is, therefore, surcharged with this sum.

"The auditors are of opinion that the birth of Miss Nancy Jack, after the date of her father's will, was such a revocation of the will as let her in for a share of all her father's estate, as well the *trusts* as other portions—in short, that she was entitled to the one-seventh of the whole."

They surcharged the accountant with $846.16, Mrs. Cowan's share of the "Bushfield property," and after deducting costs, &c., found that there was in the guardian's hands due her, a balance of $911.11.

During the proceeding Matthew Jack died, and Alice Jack, his wife and executrix was substituted on the record.

Both parties filed exceptions to the report:

By the executrix: That the accountant was surcharged with one-seventh of the "Bushfield property."

By Mrs. Cowan: That the auditors had not surcharged the accountant with one-seventh of the rents of the "Best farm;" and that they had not surcharged the accountant with one-sixth instead of one-seventh of the "Bushfield property."

The court decided that the release of Mrs. Cowan, being made in good faith and for quieting title, barred her from any claim in the "Best farm:" also, that the guardian under the circumstances had the right to take the "Bushfield property" at the appraisement and hold it discharged of the trust; and that if it were otherwise, Mrs. Cowan had by her subsequent conduct ratified his acts.

The exceptions by Mrs. Cowan were therefore dismissed, and the exception of the executrix to the surcharge sustained. The guardianship account, as originally filed, was finally confirmed.

Frank Cowan, for self and wife, appealed to the Supreme Court, and assigned the decree of the Orphans' Court for error.

*E. Cowan*, for appellant.—The estate to the testator's widow was but for widowhood: Bennett *v.* Robinson, 10 Watts 348; Commonwealth *v.* Stauffer, 10 Barr 350; McCullough's Appeal,

[Cowan's Appeal.]

2 Jones 197. Matthew was not to have it till her death, and in the interval it went to the testator's heirs: Fearne on Rem. 542; Hopkins *v.* Hopkins, Cas. temp. Talbot 44; Hayward *v.* Stillingfleet, 1 Atkins 422; Chambers *v.* Wilson, 2 Watts 495. . The release did not bind the ward: Stanley's Appeal, 8 Barr 431; Eberts *v.* Eberts, 5 P. F. Smith 110.

*H. P. Laird* and *H. D. Foster*, for appellee.—When the testator's wife forfeited her estate in the "Best farm," Matthew's remainder took effect: Doe *v.* Hunt, 14 East 601; Roake *v.* Newel, 1 Jarman 632; Brownfield *v.* Crowder, Id.; Snow *v.* Paulder, Id. 634.

The opinion of the court was delivered, November 10th 1873, by

AGNEW, J.—In view of the general intention of the testator, William Jack, as drawn from his entire will, the least that can be said of the devise to Matthew Jack of the "Best" farm, is that it is obscure. In this state of the case the real estate of the testator was brought into partition in the Orphans' Court, on the petition of William Jack, the eldest son; the widow and devisees being made parties, and bringing in also Nancy Jack, a daughter, born after the making of the will and before the testator's death, but not provided for in the will. Three of the devisees and Nancy were minors, Matthew Jack, the accountant, being their guardian. Partition being made, the "Best" farm and the "Bushfield" tract were awarded to Matthew Jack in part, and he, on behalf of his wards, took other lands, which they held together. This was in 1862. There is no complaint that this partition was unequal or unfair. To December Term 1865, an action of partition was brought in the Court of Common Pleas by Elizabeth Latta, one of the three minor devisees (then of age), along with her husband, against the other two and Nancy, in which a valuation was made of the lands Matthew Jack, their guardian, had accepted for them in the former partition. One purpart was taken by Wm. Latta, thirteen parcels were sold, and one remained unsold. Out of the proceeds Harriet received in her lifetime the sum of $1138, in various sums, running from January 7th 1867, until June 30th 1871.

After the consummation of the proceedings in the action of partition, on the 25th of March 1868, the entire family of the testator, including his widow and her second husband, joined in executing a release to Matthew Jack, his heirs and assigns, of all their estate, shares, purparts, dividends, right, title, interest, property, claim and demand, of, in, to or out of the premises called the "Best" farm. No attempt has been made to impeach this release on the ground of unfairness or fraud. Now clearly, if the Orphans' Court had jurisdiction, of which I shall treat hereafter, these pro-

ceedings, embracing the entire Jack family, vested the estate in the "Best" farm fully in Matthew Jack, By the decree in the Orphans' Court, the purpart awarded to Matthew vested in him in *severalty*, while the portion taken in behalf of his wards vested in them also in severalty, from the other children: Spangler's Appeal, 12 Harris 424. To say that he must hold his purpart in trust for his wards, whilst they can take to themselves their portion freed from any trust, title or estate in him, is simply to nullify the decree of the Orphans' Court as to him and yet maintain it as to them. Nothing short of gross unfairness or fraud added to his relationship as their guardian can so avoid the decree; especially after they have confirmed the proceeding by making partition in the Common Pleas of the portion awarded to them jointly by the Orphans' Court. The Orphans' Court is a tribunal specially charged with the care and protection of the estates of minors. The valuation is made by disinterested, sworn appraisers, and must be confirmed by the court before the rights of the parties can be affected. Each party in such a proceeding takes the purpart awarded to him in severalty, and in his own right, unless when he acts in accepting for another, as a husband for his wife, or a guardian for his ward. The court judges of the propriety and fairness of the proceeding before it, and is bound to see the interests of minors fairly represented and protected.

Then what was the character of the release following these proceedings? Clearly it was a family arrangement to carry out and reaffirm what had been done before, and not a mere release from a ward just out of leading-strings, such as is condemned in Stanley's Appeal, 8 Barr 431; Eberts *v.* Eberts, 5 P. F. Smith 110, and other cases. Such papers, obtained by a guardian before his influence has been fairly thrown off, are justly condemned. But here the whole family, all bearing similar relations to the subject, united in the release, attesting, by a common concurrence, its fairness and propriety. To say that in such a case the mere relationship of guardian and ward is primâ facie presumptive of overreaching on part of the guardian, and will set aside the legal effect of the award in the partition by a common and disinterested tribunal, having jurisdiction of the subject, is to carry the doctrine of Stanley's Appeal and similar cases to an unwarranted length. It contradicts also what so frequently has been said of the sacredness of family arrangements: Hume *v.* Hume, 3 Barr 144; Johnston *v.* Furnier, 19 P. F. Smith 449. Even a parol partition, when fairly made, is binding on infants and married women: Calhoun *v.* Hays, 8 W. & S. 127. In that case, Judge Kennedy, after referring to authorities with his usual caution and industry, concludes that "it follows from the established doctrine laid down above that if it be done by agreement of the parties without legal process, and be fair and equal, it will be good and binding upon all, whether femes

24 P. F. SMITH—22

covert or not, if their husbands join; or minors, if with the consent of their guardians." It is well to ᴀnotice also that the reason given for supporting a partition without legal process, if fair and equal, is, that the same thing could be compelled to be done at law, and be binding on infants and married women. The doctrine of Calhoun *v.* Hays is reaffirmed in McMahan *v.* McMahan, 1 Harris 376; Darlington's Appropriation, Id. 430, and Williard *v.* Williard, 6 P. F. Smith 119.

What we have said in regard to the partition bears equally upon the award of the " Bushfield " farm, taken by Matthew Jack under the same proceeding in the Orphans' Court. He holds this also in severalty under the partition, unaffected by any trust for his minor wards, unless, as it has been supposed, the Orphans' Court had no jurisdiction in the premises. But of this jurisdiction we entertain no doubt. This was a case both of testacy and intestacy, four of the parties being *minors* and *children* of William Jack, three of whom were devisees and the fourth entitled to one-seventh by legal intestacy. The fourth section of the Act of 13th April 1840 extends the jurisdiction of the Orphans' Court in partition " to all cases of testacy wherein the parties interested or any of them are minors, *or* the course of descent is not altered by the provisions of the last will and testament of the decedent, and the same proceedings shall be had thereon as in cases of intestacy, subject, however, to the provisions of the said last will and testament and the true intent and meaning of the testator." The two clauses in this act are in the disjunctive, and, says Gibson, C. J., " whether the land descended or passed by the will, the object was to give the Orphans' Court concurrent jurisdiction whenever one of the parties should be a minor, and to commit the protection of his interest to its peculiar care:" Waln's Appeal, 4 Barr 502. This was followed by the Act of 10th April 1849, § 10, which extended the jurisdiction " to all cases of testacy wherein the whole or a part of the real estate of the decedent may be devised to two or more children; and when such real estate is devised to two or more children, to be held and enjoyed in unequal proportions, the said court shall decree such an appropriation of the moneys arising therefrom as will best effectuate the intentions of the testator." This legislation is clearly sufficient to embrace the case before us, both in its letter and spirit.

Then as to the subject of the devise. The " Bushfield " farm is not devised to the guardians to be sold and converted into money. The devise carries it directly to the six children, subject only to the exercise of a conditional power of sale, dependent on the joinder or consent of the widow. It does not fall, therefore, within the scope of the decision in Selfridge's Appeal, 9 W. & S. 55. There was no absolute direction to sell and convert into personalty; the widow never demanded a sale; and besides, the devise was

opened by operation of law, to receive a seventh child under the intestate law.

The objection to the jurisdiction of the Orphans' Court is therefore not sustained, and the partition must stand and have its due operation and legal effect.

These are the only questions we deem it necessary to notice, and we therefore affirm the decree and order the costs of the appeal to be paid by the appellant.